CASH *et al.* v. LUST *et al.*, *Appellants.*

Division One, February 23, 1898.*

1. **Will:** SECURITY FOR COSTS: PROCEEDINGS IN REM. The probate of a will in common form by the probate court is, in effect, interlocutory, and only becomes final at the expiration of time permitted for its contest in the circuit court. When the contest is entered in the circuit court, the contestants will not be allowed to dismiss the proceedings, because they are proceedings *in rem*, and therefore the

*NOTE. Decided December 23, 1897, and motion for rehearing denied February 23, 1898.

Cash v. Lust.

contestants can not be required to give security for costs. Further-
more, it is the duty of the executor, in the case of a contest of a will,
to make the formal proof of its due execution, and the costs for this may
be paid out of the estate of the decedent.

2. ——: WANT OF CAPACITY. The evidence in this case is reviewed
and the conclusion reached that the evidence offered by plaintiff
wholly fails to show a lack of capacity in testator to make the will in
contest.

3. ——: ——: TEST OF COMPETENCY. The only test of testator's
competency to make a will is that the testator understood the busi-
ness about which he was engaged when he had his will prepared and
executed, knew the persons who were the natural objects of his
bounty, and understood his relations to them, and knew what property
he had and the disposition he desired to make of it.

4. ——: ——: CASE STATED. The evidence showed that testator
was a man of peculiarities and eccentricities; that he had a violent
temper and strong prejudices; that he had become in his last years
much reduced by disease and old age; that in his last years he spent
much time in prayer and claimed he prayed to God unceasingly in
regard to the will in contest; that he claimed Jesus Christ told
him, while on a sick bed, to get up and walk, and that he at once
became better; that he would abruptly change the subjects in conver-
sation; that he was much diseased, and complained of his head, con-
sulted many doctors and was much confined to his bed; that he got
lost in a little town, his nearest trading point, about the time the will
was made (though the witnesses on this point stated that they thought
his action was more through mischief than anything else); that he de-
veloped a habit of talking a little about his children and their debts to
him, and then breaking down and crying like a child; that he would
talk and pray and cry over fancied business troubles; that he did
not so act in earlier years. The will was made ten months prior to
his death. He was a man of average intelligence, usually superin-
tended his business, was about eighty years old at the making of the
will, and intelligently transacted some business the day of his death.
*Held,* that there was nothing in the evidence that tends to prove
such mental weakness or decay as would render him incompetent to
intelligently dispose of his property by will.

5. ——: CONTEST: UNDUE INFLUENCE. The undue influence exer-
cised on the maker of a will can seldom be proved by direct evidence.
The evidence in this case is reviewed at length, and it is *held* that it
does not show that the will was made under undue influence of the
devisees.

6. ——: ——: ——: CONFIDENCE IN CHILDREN. The fact that a father had confidence in his children, and entrusted them with the management of his estate in his old age, without some proof that the relation had been abused; or, that they had influence over him without proof that it had been unduly exercised, affords no reason for defeating his will on the ground of undue influence.

*Appeal from Pike Circuit Court.*—HON. REUBEN F. ROY, Judge.

REVERSED *(with directions).*

*J. H. Blair & Son* and *D. A. Ball* for appellants.

(1) The court should have required plaintiff to give security for costs. R. S. 1889, sec. 3916; *Mc-Mahon v. McMahon,* 100 Mo. 97; *Jackson v. Hardin,* 83 Mo. 176. (2) The court erred in refusing to give instruction number 2, asked by defendants. There was absolutely no evidence of mental unsoundness. *Jackson v. Hardin,* 83 Mo. 175; *Maddox v. Maddox,* 114 Mo. 35; *Norton v. Paxton,* 110 Mo. 456; *McFadin v. Catron,* 120 Mo. 252; 138 Mo. 197. (3) The court erred in refusing to give instruction number 3, asked by the defendant. There was no evidence of undue influence. *Doherty v. Gilmore,* 35 S. W. Rep. 1130; *Doherty v. Gilmore,* 37 S. W. Rep. 1127; *Maddox v. Maddox,* 21 S. W. Rep. 499; *Norton v. Paxton,* 110 Mo. 456; *McFadin v. Catron,* 120 Mo. 252 and 138 Mo. 197. (4) The court erred in refusing to give instruction number 5, asked by the defendants. The declarations of the testator were not competent evidence on the question of undue influence. *Doherty v. Gilmore,* 37 S. W. Rep. 1127; *Jones v. Roberts,* 37 Mo. App. 164; *Bush v. Bush,* 87 Mo. 480; *Spoonemore v. Cables,* 66 Mo. 579; *Gibson v. Gibson,* 24 Mo. 227. (5) Instruction number 1, given by the court on its own motion, was erroneous. It by implication told the jury that all

the declarations made by John C. Lust were evidence of the facts concerning which they were made, except his declarations giving his reasons for disinheriting the plaintiff. It commented on the evidence. *Meyer Bros. Drug Co. v. McMahan*, 50 Mo. App. 18; *Benjamin v. Railroad*, 50 Mo. App. 602; *Doud v. Reid*, 53 Mo. App. 553; *Railroad v. Stoyed Co.*, 120 Mo. 541. (6) The court did not properly reprimand plaintiff's counsel, J. D. Hostetter, for making an unauthorized statement in his argument to the jury. *State v. Fisher*, 124 Mo. 460; *State v. Young*, 99 Mo. 666; *State v. Jackson*, 95 Mo. 623; *Carder v. Primm*, 64 Mo. App. 92.

*Hostetter & Jones* and *Clark & Dempsey* for respondents.

(1) There is nothing in appellant's complaint about the action of the trial court permitting the case to be heard without requiring plaintiffs to give security for the costs. It was a discretionary matter for the court in any event, and when plaintiffs admitted that they would be unable to comply with the rule to give security, if made, then it would be useless for the court to indulge in a meaningless formality of making an order which it knew beforehand the parties were unable to comply with, and which it had no power to enforce. It could not refuse to hear plaintiffs' evidence and only hear one side of the case. That would certainly be against public policy and might result in establishing a will which, had all the evidence tendered been heard, could have been clearly shown not to be the will of the deceased. Neither could the case be dismissed, as the authorities are to the effect that when a will contest is once put on foot, it is the duty of the court to hear the evidence and either reject or establish the will regardless of the wish or effort of any of the parties to dismiss the proceedings. This proposition appellants concede

to be correct. Our courts have decided in divorce cases when a defendant has failed to comply with the order of the court as to payment of alimony, he is neither in contempt nor can the court strike out his answer for such failure or refuse to hear pertinent evidence tendered by him. *McMakin v. McMakin*, 68 Mo. App. 57. Besides, one of the plaintiffs was suing by a guardian and curator, and it has never been the policy of the law to require security for costs in such instances. R. S. 1889, sec. 2249. The very case cited by appellants, *McMahon v. McMahon*, 100 Mo. 57, directly militates against their contention. (2) We submit that there was ample evidence on both the issues of mental incapacity and undue influence to support the finding below, as a careful reading of respondents' statement, which can be verified by the record, will show. Appellate courts will not interfere even though they may believe the finding of the jury to be against the weight of the evidence. *Young v. Ridenbaugh*, 67 Mo. 574; *Garland v. Smith*, 127 Mo. 567. (3) Even conceding that said refused instruction number 5 states a correct proposition of law, yet the effect which the jury should give to the declarations of the testator is clearly and correctly set out in instruction number 1 given by the court of its own motion wherein the jury are told not to consider declarations made by the testator as to his reasons for disinheriting plaintiff as evidence of the truth of the facts in regard to which they are made, as they are not competent evidence for such purposes, but the declarations may be taken into consideration in determining the condition of the mind and affection of said John C. Lust at the time said will was signed. No declarations of the alleged testator were given in evidence by respondents save those giving reasons why he was disinheriting the plaintiff, Irene Cash. (4) We contend that sufficient showing

of confidential and trust relations have been made between Chris and Sam on the one side and their father, the alleged testator of the other, whereby they come under the well recognized rule that the *onus* is cast upon them to prove that they did not exert an undue or unfair influence to procure the making of the will, there being a presumption raised against them when the trust or confidential relationship is once proven to exist, but the trial court, in giving defendant's instruction number 1, placed the burden of proving the existence of undue influence on the plaintiffs, and it might be fairly contended erred in defendants' favor in so doing. There was also the unreasonable and unexplained action of the testator in disinheriting Harry Liter, his grandson, which would also require these sons to show clean hands. *Gay v. Gilliland*, 92 Mo. 250, which has been approvingly cited in all the latest cases by this court.

MACFARLANE, J.—This is a suit contesting the will of John C. Lust, deceased. It is prosecuted by Irene M. Cash, a daughter of deceased, and her husband, Paul Cash, and Harry Liter, a grandson of deceased, by his guardian, against nine defendants, sons and daughters of deceased.

The invalidity of the will is sought to be established on two grounds: *first*, mental incompetency of the testator; and *second*, that it was made through the undue influence of defendants Christian G. Lust and Samuel Lust. The answer admits the due execution of the will, denies the other allegations of the petition, and states that the paper writing is the last will of the deceased.

On the trial defendants made proof of due execution and attestation of the will, and offered evidence that the testator, at the time of executing it, was of

sound mind, and read the will in evidence. By item 1 deceased directs the payment of his debts. *Item 2:* His widow is given the home farm and household and kitchen furniture for life. *Item 3:* Plaintiff Irene Cash is given the sum of $150. *Item 4:* Plaintiff Harry Liter is given $100. *Item 5:* The balance of his property is divided equally among his other nine children, the defendants herein. *Item 6:* At the death of his wife the property given her for life is to be divided among the defendants. Christian G. Lust is named as executor.

Evidence bearing upon the mental condition of deceased and of the influence said defendants Christian and Samuel Lust had over him, was then offered by the parties. The evidence will be stated in the opinion. At the close of all the evidence defendants asked, and the court refused to give, the following instructions:

"1. The court instructs the jury that under the evidence in the cause their verdict must be for the defendants.

"2. The court instructs the jury that there is no evidence of the unsoundness of testator's mind at the time of the execution of the will; therefore as to that issue your verdict must be that the paper read is the will of the deceased, John C. Lust.

"3. The court instructs the jury that there is no evidence in the cause as to undue influence upon the part of Christian G. Lust and Samuel Lust upon the mind of the testator; therefore as to that issue your verdict must be to sustain the will.

"4. The court instructs the jury that there is no evidence that the testator was of unsound mind and for that reason incapacitated to make a will; neither is there any evidence in the cause of undue influence having been made upon the mind of the testator; your verdict must therefore be that the paper read to you

in evidence is the last will and testament of John C. Lust."

The issues were submitted upon instructions given by the court. The verdict was that the paper writing was not the will of John C. Lust. Judgment was entered rejecting the will and defendants appealed.

I. At some time before the trial defendants filed a motion asking a rule on plaintiffs to give security for the costs. This the court refused on the ground that security could not be required as a condition to prosecuting a suit contesting a will. Defendants complain of this ruling of the court. The probate of a will in common form by the probate court is, in effect, interlocutory, and only becomes final and conclusive at the expiration of the time parties in interest are allowed in which to contest its validity in the circuit court. When a contest is entered, the circuit court thus acquiring jurisdiction should proceed, as required by statute, to determine whether the paper writing in question is, or is not, the will of the decedent. Contestants will not be allowed to dismiss the proceedings, for they are *in rem* and all persons interested, whether as contestants or proponents, are entitled to have the formal and conclusive judgment of the court either rejecting or confirming the will. *McMahon v. McMahon*, 100 Mo. 97, and cases cited. It follows that contestant can not be required to give security for the costs. It has been held by this court in a recent case that the cost of making the formal proof of the due execution of the will, whether in solemn or common form, may be paid out of the estate of the decedent, and in case of a contest it is the duty of the executor named to make this proof if none of the parties interested do so. *In re Soulard's Estate*, 141 Mo. 642. By the formal proof is meant such as is required to be made *ex parte* in the probate court. R. S., secs. 8880 and 8884. There can be no doubt that

contestants would have the right to withdraw their objections at any time before the case is submitted, and thereby relieve themselves of costs that may subsequently accrue, but they can not be forced to do so by putting a condition upon their right to contest, such as requiring them to give security for the costs.

II.    The important and troublesome questions in this case are, whether there was evidence of mental incapacity or of undue influence, which authorized a submission of these issues to the jury.    Defendants, by separate requests, asked the court to instruct the jury that there was a failure of proof on each issue.    These instructions were refused and both issues were submitted to the jury.    It can not be determined, therefore, whether the jury found against the validity of the will on the ground of incapacity or of undue influence. If, therefore, there was a failure of proof upon either or both, the judgment will have to be reversed.

III.    We have carefully read the evidence offered by plaintiffs, for the purpose of proving want of sufficient mental capacity on the part of the testator to make the will, and are of the opinion that it wholly fails of its purpose.

Before entering into a review of the evidence on the issue of incompetency, it may be well to state that the test of competency is only that the testator understood the business about which he was engaged when he had his will prepared and executed, knew the persons who were the natural objects of his bounty, and understood his relation to them, and knew what property he had and the disposition he desired to make of it.    With a capacity reaching this standard and under a free exercise of it, the courts will not interfere with his right to dispose of his property according to his own will, however unjust the disposition may appear. *Thompson v. Ish*, 99 Mo. 160; *Maddox v. Maddox*, 114

Mo. 35; *McFadin v. Catron*, 120 Mo. 268, and 138 Mo. 197.

It appears from the statement of respondent, as well as from the undisputed evidence, that the testator John C. Lust was, at the time of making his will, about eighty years of age. His will was made October 4, 1893, and he died in August, 1894. He was a farmer and had lived upon a farm near Spencersburg, Pike county, for many years. He left an estate valued at about $17,000. He had been all his life a close, hard working man, and required all his children to work also. He was a man of violent temper and passions, and strong prejudices. During the last years of his life he was in bad health, some of the time confined to his bed. Respondents' counsel state the evidence bearing on the question of incapacity as follows: "But in his latter years, as his mind weakened, he developed a mania for praying, and claimed that he had prayed to God unceasingly in regard to the will now being contested. He also professed to have had communication from Jesus Christ while on a sick bed in 1893, the year the will was made. He claimed Jesus Christ came to him while sick, and said, 'Old man Lust get up and walk,' and he at once got better. It is also in evidence that he would abruptly change subjects when in conversation, thus showing that he lacked continuity. That he was very much diseased with a combination of ailments and complained of his head. Consulted many doctors, and was confined to his bed a great deal the last year or so of his life. Two witnesses testified that the old man got lost twice in the little town of Frankford in 1893. That was his nearest railroad station and had been his trading point for forty years. Other witnesses testified that he had in 1893 developed into the habit of talking a little, and then breaking down and crying like a child over some

real or fancied business reverse.   Or if anything went wrong about the work he would talk and pray and cry over it by turns.   These actions were never known to exist in former years.   In fact his previous life had been just the opposite.''

Going a little more in detail, one witness who stated the fact that testator cried after ''talking a little'' was *John T. Hutchinson*.   He testified to having seen him in Bowling Green in January or February, 1893. ''I asked the old gentleman how he was getting along. He said not very well, and went on to tell me about his boys.   Said he had sold them some land on the prairie, and they hadn't paid him any money.   That he had a note and deed of trust on the land and he had to pay the taxes, and broke down completely and commenced crying and stopped and waited awhile and then proceeded, until I finally walked off and left him.'' . . . . . . . ''He told me the boys had borrowed some of the girls' money that they had worked hard for, and gone through with it.   I talked with him about half an hour, and his memory seemed to be good.''   In regard to his getting lost in Frankford, *Joseph Thompson* testified in chief that several persons were standing near the butcher shop.   Testator came along carrying a satchel.   ''He asked some of us the way home.   Some of us told him. Some of us boys was laughing about it, and said the old man must be full.''   On cross-examination the witness was asked if he did not think the old man asked the question more through mischief than anything else.. He answered:   ''I expect it was that way.   I took it that way.''   The evidence of the two subscribing witnesses and the lawyer who wrote the will, and a number of the neighbors of deceased, bore testimony that he was a man of average mental capacity and generally superintended his own business when he was physically able to do so until his death.   On the day of his death he

drove to town and transacted, intelligently, some business, and as he was returning home his team became frightened and ran, and he was thrown from the wagon and killed.

That testator had peculiarities and eccentricities, can not be disputed. That he had a violent temper and strong prejudices, the evidence clearly shows. That he had become much reduced by disease and age is also true. But we see nothing in the evidence that tends to prove such mental weakness or decay that would render him incompetent to intelligently dispose of his property by will. Some of the ablest men the world has produced have prayed God for guidance in all things, and many believe in Divine Providence and visitations. That the testator prayed God's guidance and direction in making his will, surely does not tend to prove his mental incapacity. The emotion displayed when talking of the failures in life of some of his sons shows possibly a weakness of old age and infirmity coupled with an emotional nature, but nothing more.

But taking the statement of the evidence as made by counsel for respondents there is nothing tending to prove that the testator did not understand the business about which he was engaged when he had his will prepared and executed; that he did not know his children and grandchildren who were the natural objects of his bounty, or that he did not know what property he had and the disposition he intended to make of it. The court committed error, therefore, in refusing to give the second instruction asked by defendants.

IV. On the question of undue influence there is more trouble, for that is a matter which can seldom be proved by direct evidence. The two sons who are accused of unduly influencing the testator in the dis-

position of his property were thirty-eight and forty years of age, respectively, were unmarried and lived on the farm with their father. They had been fairly prosperous in business, had for some years assisted their father in the management of his affairs, and had the farm leased for the year 1893, in which the will was made. In the circumstances it was but natural that their father should look to them for assistance and should consult them on important business matters. They naturally had some influence over him and had also the opportunity of improperly exercising it in the matter of disposing of his property by will. On the other hand, the evidence shows that the testator had, when in good health, been a man of strong will power and was not subject to the influence of others. The will itself, except as to the provisions made for plaintiffs, is just and reasonable. The two sons, Christian and Samuel, secured to themselves no advantages over the other seven children of the testator. There is no direct evidence which tends to prove that these two sons desired the disinheritance of plaintiffs, or even suggested it to their father. The burden of proof was therefore on plaintiff to satisfy the jury, by substantial evidence, that the will was the product of the undue influence of these two sons.

The evidence which contestants rely upon as tending to prove undue influence is detailed in their statement as follows: "It is in evidence that Chris and Sam were overheard by plaintiff, who was in an adjoining room, on one occasion talking against plaintiff and her sweetheart, Paul Cash, and afterward the old man told her that Paul's attentions to her were raising a contention with the boys, and he also stated to witness Jones that Sam and Chris had told him of Paul Cash's alleged brags that now he had gotten the old man's girl he was going to get some of his money, but he would

see that he didn't.   The son Sam brought his father
from home in a buggy on the occasion of making his
will.   They went from home to the Audrain county
farm near Farber, where the other children lived, and
stayed all night.   Started the next morning to Bowling
Green, where the will was made, stopping an hour or
more at Farber.   They (Sam and his father) stayed
at Gilbert Neffler's over night while in Bowling Green.
Neffler was a German friend of Lust's and a witness
for defendants.   Witness J. H. Blair, also attorney for
defendants, prepared the will.   Sam and Chris both
deny any knowledge that the will was made until after
the old man's death.   It is also abundantly shown in
evidence that Chris and Sam had almost complete con-
trol of the old man's business during the last two or
three years before his death.   Ed Biggs, county clerk,
testified that he went to the Lust home to buy some
stock and the old man wouldn't talk trade because he
said Sam and Chris were not at home.   And witness
Jesse B. Jones testified that Sam sold him the old
man's wheat crop in 1893 and received the money
therefor, and witness Valentine Tapley testified that
the old man deferred to Sam and Chris, particularly
Chris, as to all business."

The conversation between the father and sons, re-
ferred to by plaintiffs, was before the marriage of
Irene to Cash.   She testified: "They would keep
telling father that he (Cash) was no account and was
not fit for anything, and all like that."   The evidence
tends to prove that testator at first consented to the
marriage of his daughter Irene, to Cash, but afterward
changed his mind and bitterly opposed it.   Two wit-
nesses testify that on the day the will was written Mr.
Lust gave, as his reason for the small provision made
his daughter Irene, that she cursed and mistreated
him, and that she and her husband were not worthy of

any property. "That he was almost sure that they would not take care of it, and would squander it, and that he would not make plaintiff equal with the balance." That Paul Cash had made his brags that he had got the daughter and would get a part of the estate. Plaintiff testified that she "never cursed her brother that she knew of." And Cash, while he testified in the case, did not deny making the remarks attributed to him. Both sons testified that they did not know a will had been made until after their father's death. The motive of the testator for the small portion given Mrs. Cash is very clearly shown. Nothing appears in the conduct of the two sons which was calculated to create the prejudice and want of confidence in the son-in-law, Cash, except the opposition they made to the marriage. That opposition may have been for good cause, at any rate it had no reference to the subsequent act of the father in making the will. A brother could surely advise against what he regards as an improvident marriage of his sister, without having imputed to him an intention of thereby securing her disinheritance. The fact that the father had confidence in his sons without some proof that the confidence had been abused; or that the sons had influence over the father without some proof that the influence had been unduly exercised, affords no reasons for defeating the will. Mr. Lust had the right to dispose of his property as he did, though he may have been actuated by unjust prejudices. The presumption is in favor of the validity of the will and plaintiffs have offered no evidence tending to rebut that presumption.

No issue was made on the due execution of the will. Evidence of the attesting witnesses and others is sufficient to authorize its probate. The judgment is therefore reversed and the cause is remanded with directions to enter a proper judgment confirming the will. All the judges of this division concur.